ROGERS v. WILEY et al.

(Supreme Court, General Term, Third Department. May 21, 1891.)

1. FACTORS AND BROKERS—DEMANDS FOR MARGINS—WAIVER.

Defendants, stock-brokers, were carrying a "short" sale of Lackawanna stock for plaintiff on a margin furnished by him. The stock having begun to rise, defendants telegraphed to plaintiff: "Lackawanna, 143 bid. Send more margin, or advise us what to do." Plaintiff answered: "Buy 2,000 at market, and stop loss with margin either way." Defendants replied on the same day: "Don't want to carry Lackawanna on six points margin. May not be able to stop it if it goes up. Will buy in your stock when present margin is about exhausted." Defendants did not buy as directed, but on the next day advised plaintiff to stay "short," and promised to carry the stock for him until he could "get out all right," to which plaintiff assented. *Held*, that defendants' agreement to carry plaintiff's stock until he could get out all right was a waiver of the notice to furnish more margin, and defendants could not buy in plaintiff's stock and cover the short sale without first notifying plaintiff to furnish more margin.

2. SAME—DISOBEYING INSTRUCTION—MEASURE OF DAMAGES.

Where a stock-broker, who is carrying a "short" sale for a customer, disobeys instructions given on a rise in the market to buy so as to cover the "short," the customer's measure of damages is the difference between the market value of the time of the broker's instructions to buy, and the price at which the broker actually bought.

LEARNED, P. J., dissenting.

Appeal from circuit court, Washington county.

Action by James C. Rogers against William G. Wiley and Frederick L. Smith. Judgment was entered on a verdict for plaintiff, and defendants appeal.

Argued before LEARNED, P. J., and LANDON and MAYHAM, JJ.

*J. S. Potter*, for appellants. *J. C. Rogers*, for respondent.

LANDON, J. For several months prior to August 15, 1882, the defendants, who were stock-brokers in the city of New York, were carrying for the plaintiff, who resided at Sandy Hill, N. Y., a "short" sale of 1,000 shares of Delaware & Lackawanna stock upon a margin furnished them by plaintiff. For about a month prior to August 15th the price of the stock had been rising, and the parties had had some correspondence about it. The plaintiff and the defendant Wiley had interviews at Saratoga respecting it on the 25th and 27th of July. The plaintiff, at the first interview, said he thought he had better cover, and Wiley advised him to wait. At the second interview—the price still rising—the plaintiff again proposed to cover, and the defendant advised him to wait, and suggested that he make a "turn in the market." August 9th the defendants, at New York, telegraphed the plaintiff as follows: "Lackawanna, 143 bid. Send more margin, or advise us what to do." Plaintiff answered: "Buy 2,000 at market, and stop loss with margin either way." Defendants replied the same day: "Don't want to carry Lackawanna on six points margin. May not be able to stop it if it goes up. Will buy in your stock when present margin is about exhausted." The next day, August 10th, the plaintiff met Wiley at Saratoga, and complained that his order of the previous day was not filled, and proposed to cover then, and save the balance of his margin. Wiley advised him not to buy, but stay short, and said that if he would do so they would carry the stock for him until he could get out all right. Plaintiff answered that with that understanding he was willing to wait, and leave it as it was. August 15th the rise in the price about exhausted the margin, and defendants, without notice to plaintiff subsequent to August 9th, bought in the stock at an average of 148⅞, and covered the short sale, and notified the plaintiff. Plaintiff immediately repudiated the transaction by letter sent to the defendants. The matter ran along until February 10, 1883, when defendants received an order from plaintiff to cover his stock at market price. The price was then 121⅝. Defendants, insisting that the

stock had been covered August 15th, refused to comply with the order of February 10th. Upon the basis of the purchase of August 15th there would be due plaintiff $82.71. Upon the basis of the order of February 10th there would be due him $16,420.43. The jury gave plaintiff a verdict for one-half the latter sum. The defendant Wiley contradicted the version of the interview at Saratoga given by the plaintiff, and gave a different one, but, as the jury found for the plaintiff, we adopt his version. The testimony tended to show that if defendants had filled plaintiff's order of August 10th the plaintiff might have made some money if he "had struck it right," as he expressed it, in giving his subsequent orders. But the trial judge held that the defendants were not obliged to fill that order because plaintiff's margin was then below 20 per cent., at which figure he was to keep it; but the trial judge instructed the jury that if Wiley at the interview with the plaintiff at Saratoga, August 10th, agreed to keep the stock borrowed, the defendants' purchase of August 15th was unauthorized, because it was concededly made without a further request to put up more margin. The judge further held that such an arrangement, if made, was not an agreement binding the defendants to carry the stock for any given time, because it was without consideration, but it was a waiver of their right under the contract to cover until they had given plaintiff notice to make his margin good. He further held that, unless such an arrangement was made, the plaintiff could not recover. The learned counsel for the defendants urge that the arrangement, if made, whether termed an agreement or a waiver, was void for want of consideration. They argue the case as if the defendants had agreed to carry the stock after the margin was exhausted, and incur whatever loss might result, and give the plaintiff whatever profit might result. But the trial court distinctly held that the arrangement was nothing but a waiver of the existing right under the contract to cover until the defendants had given further notice. Before the interview of August 10th the defendants had given plaintiff notice to furnish more margin. With that notice in force, the defendants had the right to buy as they did on the 15th. If no notice was in force, they had no right to buy without giving plaintiff notice. *Gillett* v. *Whiting*, 120 N. Y. 403, 24 N. E. Rep. 790; *White* v. *Smith*, 54 N. Y. 522; *Hess* v. *Rau*, 95 N. Y. 362. If the defendants waived that notice, they thereby took upon themselves no additional obligation; they retraced their previous steps; they simply said, in effect: "We do not stand upon that notice, or upon any right to cover without notice. We hope no notice will be necessary; but if it should be, you may wait until we give it." Clearly, the plaintiff could safely wait until he received notice. Besides, the loss, if any, would have to be made good by the plaintiff. It would be a case of trusting to his credit instead of to his cash. The complaint characterizes the transaction between Wiley and the plaintiff on the 10th of August as a contract, by which the defendants agreed to carry the short sale of stock as long as plaintiff pleased. We assume this characterization to be wrong. But, in addition to this erroneous characterization, the complaint sufficiently alleges what the actual contract between the parties was, and what the acts of the defendants were which are relied upon as constituting its breach. The breach of the contract is no part of the contract itself, but results from acts *in pais* under it. The question is whether such acts do in fact constitute a breach. *Holmes* v. *Holmes*, 9 N. Y. 525. If these acts show that the defendants closed the transaction without giving the plaintiff the notice to protect himself which the circumstances required, then they are liable for the loss resulting from this breach of duty; and in determining whether any notice was due from the defendants to plaintiff we must look into the circumstances as they actually existed. Any one can see that a notice might be given one day under the pressure of the circumstances of that day, and be withdrawn another day under changed circumstances, or upon a personal explanation or solicitation. Fair dealing is the main test with re-

spect to such matters; the duty of each party being not to mislead the other to his loss. It seems to us that the least that can be made of the interview of August 10th is that the plaintiff could rely upon not being closed out under any previous notice, but could wait until he heard further from the defendants.

Exception is taken to the rule for the measure of damages. The court stated it to be the difference between the price at which defendants actually bought the stock and the price at which they could have bought it in when they received plaintiff's order to do so on the 10th of February following. This rule is sanctioned by authority. *Campbell* v. *Wright,* 118 N. Y. 594, 23 N. E. Rep. 914; *White* v. *Smith,* 54 N. Y. 522. It is urged that the plaintiff ought to be confined to the best price for which he could have bought the stock within a reasonable time; say 30 or 60 days, as in cases of unauthorized sales. *Wright* v. *Bank,* 110 N. Y. 237, 18 N. E. Rep. 79. But the plaintiff sustains no damages until his order to buy is disobeyed, and the date of that order fixes the date of the measurement of his damages. We can see that this rule may operate harshly, but it would be equally harsh to compel the plaintiff to buy against his judgment and inclination, and thus give to the defendants' wrong a compulsion which would deprive plaintiff of his liberty of action. The case was submitted to the jury upon the questions of fact in a careful and satisfactory manner, and the fact that the jury gave the plaintiff only half the amount which they ought under the rule of damages given them by the court we think is satisfactory evidence that they were not influenced by passion or prejudice. Judgment affirmed, with costs.

MAYHAM, J., concurs.

LEARNED, P. J. (*dissenting.*) The question in this case seems to narrow itself down to one point. The plaintiff was dealing in stocks through defendants as his brokers. By the terms of the agreement he was bound to keep with them 20 per cent. margin. He had sold through them 1,000 shares of Delaware, Lackawanna & Western stock "for the short account" at 120. On the 9th of August, 1882, defendants telegraphed plaintiff: "Send more margin, or advise us what to do." On that day the stock was 143. Plaintiff answered: "Buy 2,000 at market, and stop loss with margin either way." Defendants responded at once: "Don't want to carry D., L. & W. on six points margin. May not be able to stop it. If it goes up, will buy in your stock when present margin is about exhausted." The plaintiff's margin would be about exhausted when the stock should reach 149. A letter was written by defendants to plaintiff on this same day, stating the matter substantially as in the telegram, and asking if this met his approval. On the 10th of August the plaintiff and one of the defendants met in Saratoga, and had a conversation. There is a conflict between them as to what took place. Since the verdict of the jury, we must take the plaintiff's version as correct. It is as follows: He complained to Mr. Wiley that the firm had not bought the 2,000 shares, and said: "If you want more margin I can give it." Mr. Wiley advised him to stay short; saying: "I do not want to carry this stock and be long of it for anybody." The plaintiff said to him: "Your telegram said that if the market went up you were going to cover my shorts. That would bring it up to 49 or 50. I do not want to leave it in any such position as that. If I am liable to be closed out here within a day or two, or where it gets there, I want to know it." Mr Wiley replied: "We will carry the stock for you until you can get out all right. I had rather do it than buy it and be long of it at that price." On the strength of this conversation the plaintiff avers in his complaint that defendants agreed to carry and keep good plaintiff's said short sale and contract in such stock as long as plaintiff pleased. The learned justice who tried the action held that this conversation was not

binding as a contract, for want of a consideration; but that it was a waiver by defendants of their right to a margin for the time, and that they could not go on and purchase to recover until they had given plaintiff notice to furnish the requisite margin. It will be seen that neither the complaint nor the plaintiff's testimony states in terms any waiver of the right to require a margin. Both the complaint and the plaintiff's testimony aver an absolute contract and promise on the part of defendants to carry the contract as long as plaintiff pleased, or at least till he could get it out all right; so that, if the complaint and plaintiff's testimony are true, the defendants would never have any right to close the contract against plaintiff's wishes, whether they demanded further margin or not; at least until plaintiff could get out all right. This, it would seem, would be when the stock dropped to 120. That appears to be the price at which plaintiff had sold the 1,000 shares short; and therefore the promise of Mr. Wiley, according to plaintiff, was that defendants would carry the stock until it should fall to that point, if plaintiff wished. Now, the learned justice held that the agreement was void for want of a consideration, as it was a mere naked promise on defendant's part, for which plaintiff paid or parted with nothing. But he held that this was a waiver of the right to demand a margin until such right should again be obtained by another demand; so that the learned justice construes this conversation as if Mr. Wiley had said: "You need not send away any margin until further notice." That is not the agreement, as plaintiff testifies. He says that Mr. Wiley promised: "We will carry the stock for you until you can get out all right. I had rather do it than buy it, and be long in it at that price." If defendant had bought the 2,000, they would have been entitled to call for a large margin from plaintiff. Rather than buy at that price these 2,000 shares, for which plaintiff would have had to advance a margin, the defendant Wiley agrees absolutely to carry the stock until plaintiff can get out all right, which is equivalent to saying "until the stock falls to 120," if we are right in understanding that to be the price at which the transaction began. Then Mr. Wiley, as plaintiff testifies, said further: "If it should go up to 149 or 150, we will not close you out. We will carry the stock for you until you can get out all right. We will work it out for you, and you will yet make money." Such language as this did not mean simply that defendant waived the demand for a margin already made, but might renew the demand the next day. It meant an absolute prom se to carry the stock, and work it out. And the reason is explained by plaintiff when he testifies that Mr. Wiley's previous advice had proved incorrect, and therefore that Mr. Wiley may have desired to save plaintiff from loss. Now, it is undoubtedly true that an absolute agreement to carry the stock, to work it out so that plaintiff would make money, might carry by implication a waiver of the existing demand for a margin. But it included much more; and, if the whole agreement be held void for want of a consideration, on what principles can it be held valid as to a waiver implied in it? This statement of the conversation appears in plaintiff's copy of a letter to Mr. Wiley, August 16th, (which defendants deny having received.) The plaintiff says in that letter that Mr. Wiley "said if I would stay short of it, you would take care of it for me until I could get out all right; and that I would make money by so doing. Relying on this, I went home satisfied." That is, the plaintiff relied on defendants' promise that they would take care of the stock until he could get out all right. If the understanding was that plaintiff was to advance the necessary margin when called on, the defendants would not be taking care of the stock for him. And that letter in which plaintiff repudiates a purchase made for him the 15th does not place such repudiation on the ground that there had been a neglect to call for a margin, but on the ground of the promise to carry the stock. At the time of the conversation the plaintiff was under obligation, by the terms of the agreement with defendants, to send more margin. If defendants had said to him,

"You need not send the margin" till we notify you again, and plaintiff had waited for such notification, very possibly that would have been a waiver by defendants of their demand for margin, so that they could not have closed out the transaction until they had made another demand for margin. But instead of that the defendants, as plaintiff says, made a general promise to carry the stock for him until he should get out all right. If this was not binding because without consideration, we cannot substitute a different agreement,—a mere waiver which might be binding.